UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br>v.<br><br>BERNARD POUNCEY,<br><br>    Defendant. | No. 19 CR 579<br><br>Judge Thomas M. Durkin |

**MEMORANDUM OPINION AND ORDER**

Defendant Bernard Pouncey was charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g) based on evidence found during a warrantless search of his yard and house. Pouncey moved to suppress the physical evidence of the firearm and his post-arrest statements. R. 24. On December 16, 2019, the Court held an evidentiary hearing on the motion to suppress and the parties subsequently filed post-hearing briefs. For the following reasons, the Court denies the motion to suppress.

**Background**

On December 16, 2019, the Court held an evidentiary hearing on Pouncey's motion to suppress. Pouncey and Chicago Police Department Officers Juan Gali and David Garcia testified. The government also introduced footage from body cameras worn by Officer Garcia and Officer Daniel Guzy.

a) Testimony of Officer Juan Gali

Officer Gali testified that on April 27, 2019, at around 10:00 p.m., he and Officer Clara Cinta were on patrol near 63rd Street and Princeton Avenue when they

heard gunfire. The officers began driving northbound on Princeton towards the shots when they received a notification from the Strategic Decision Support Center that four gunshots had been detected in the rear of 321 West 61st Street. When the officers arrived at the residence, they began walking through a vacant lot on the west side of the house towards the back. The house had a fence around the front and backyard. The fence had a gate to enter the front yard and a second gate at the back of a gangway between Pouncey's house and a neighbor's house that led to Pouncey's backyard. As the officers were walking, they heard two additional gunshots that appeared to come from the rear of the residence. The officers approached the backyard and observed an African American individual wearing a white t-shirt run into the home from the porch. At that point, Gali walked from the vacant lot to the front of the house, entered through the front gate, and proceeded down the gangway between Pouncey's and his neighbor's house to enter the backyard. When he entered the backyard, he walked up the stairs to the open back porch. There he saw shell casings on the porch leading to the door. It had snowed that night and Gali testified that he saw no footprints in the yard or on the porch stairs. He also observed no bullet holes in the back of the residence. Gali walked down the porch stairs to wait for additional units to arrive. Then, Pouncey came out of the basement door wearing a white t-shirt. Gali and Officer Cinta (who had by then also entered the backyard) handcuffed him and conducted a pat-down, which revealed no weapon. Shortly thereafter, other officers arrived. While Pouncey remained handcuffed, and as captured on Officer Daniel Guzy's bodycam, Officer Gali said to Pouncey: "We can do this the hard-easy

way, or we can write up a search warrant and tear the whole f***ing house up." Pouncey responded: "Go ahead, bro. I'm not shooting at nobody." Officer Gali testified that he understood this as consent to search the house. Meanwhile, Pouncey's girlfriend was also at the basement door and she told the officers that her minor daughter was inside. The officers subsequently searched the house and found a gun underneath the child's mattress. Pouncey was arrested and charged with being a felon in possession of a firearm.

  b) Testimony of Officer David Garcia

Officer David Garcia testified that he received a ShotSpotter notification that gunshots had come from the back of 321 West 61st Street. Garcia went to the residence and spoke with Pouncey and Pouncey's girlfriend at the front door. Pouncey denied having knowledge of gunshots coming from the property. The encounter ended and Garcia began walking through the vacant lot towards the other officers in the backyard. When Garcia saw the officers, they informed him that there were shell casings on the back porch. He returned to the front of the house and knocked on the door to speak again with Pouncey, but no one answered (it appears that Pouncey had already been detained in the back). Garcia then joined the officers in back, at which point an officer told him that Pouncey provided consent to search the house.

  c) Testimony of Bernard Pouncey

Pouncey denied that he gave verbal consent to search his home. He explained that "go ahead, bro" meant he wanted Officer Gali to get out of his face and to end the argument.

3

**Analysis**

Pouncey argues that the physical evidence recovered from his home should be suppressed because of the officers' warrantless search of his house and curtilage. He also argues that his post-arrest statements should be suppressed because of his unlawful arrest. This requires the Court to answer two questions. First, did the officers lawfully enter Pouncey's backyard? And second, did they lawfully enter his home?

I. Did the Officers Lawfully Enter Pouncey's Backyard?

Pouncey first argues that the officers unlawfully searched his backyard without a warrant. "Warrantless searches of areas entitled to Fourth Amendment protection are presumptively unreasonable, but the government may overcome this presumption by demonstrating that, from the perspective of the officer at the scene, a reasonable officer could believe that exigent circumstances existed and that there was no time to obtain a warrant." *United States v. Schmidt*, 700 F.3d 934, 937 (7th Cir. 2012). Exigent circumstances exist "where police reasonably believe that their safety, or the safety of the public, may be threatened." *United States v. Huddleston*, 593 F.3d 596, 600 (7th Cir. 2010).

*United States v. Schmidt* informs the Court's analysis. In *Schmidt*, several police officers responded to a series of gunshots in a Milwaukee neighborhood. Two hours after the gunshots, officers observed bullet holes in a car parked adjacent to the backyard of a duplex apartment. There were also spent casings on the ground and bullet holes in the duplex itself. The officers entered the backyard through a chain-

link fence and discovered a firearm. The defendant was charged with being a felon in possession of a firearm and he subsequently filed a motion to suppress. The court held that exigent circumstances justified the warrantless entry into the yard because it was reasonable for an officer to believe that there were wounded victims, and the officer did not need to know someone was actually shot in order to investigate. 700 F.3d at 938.

As in *Schmidt*, exigent circumstances justified the officers' entry into the yard. While the officers did not see shell casings, they had a report that gunshots had been fired from the backyard. They then heard gunfire that appeared to come from the back of the residence, and they observed an individual run into the house as they approached. When considering the facts known to the officers at the time, they certainly had a reasonable basis to believe someone may have been in danger and in need of assistance. *See United States v. Brown*, 64 F.3d 1083, 1086 (7th Cir. 1995) ("We do not think that the police must stand outside an apartment, despite legitimate concerns about the welfare of the occupant, unless they can hear screams."). Moreover, the officers contained their investigation to the yard where the activity had taken place, a less onerous intrusion than barging into the house. *See id.* ("The less intrusive a search, the less justification is required."). Once the officers lawfully entered the backyard, they saw the spent shells on the porch in plain view. *See*

*Schmidt*, 700 F.3d at 939 (scope and breech of a firearm lawfully seized because they were in plain view after officers entered the yard due to exigent circumstances).[1]

II. Did the Officers Lawfully Enter the House?

Pouncey also argues that the officers unlawfully entered his house without a search warrant. The government contends that: 1) Pouncey voluntarily consented; 2) exigent circumstances justified the officers' entry; and 3) the gun would have been inevitably discovered.

1) Consent

The first question is whether Pouncey gave consent to search his house. *See United States v. Richards*, 741 F.3d 843, 847 (7th Cir. 2014) (voluntary consent is an exception to the warrant requirement). In response to Officer Gali's statement that they could do it the easy way or get a search warrant, Pouncey responded, "go ahead, bro." The Court reviewed the bodycam footage and the audio and concludes that Pouncey is providing consent to a search. Moreover, the Court did not find credible Pouncey's testimony at the suppression hearing that "go ahead, bro" meant he wanted the officer to get out of his face so that he could end the argument. And to the extent there was any ambiguity, it was eliminated when Pouncey did not object after the officers began their search. While Pouncey was objecting loudly to being called a criminal and of being accused of shooting a gun, he said nothing as the officers entered his home. *See United States v. Gonzalez-Ruiz*, 794 F.3d 832, 836 (7th Cir.

---

[1] Pouncey's reliance on *Florida v. Jardines*, 569 U.S. 1 (2013) is misplaced. In that case, unlike here, there were no exigent circumstances that justified the officers' search of the defendant's porch.

2015) (holding that if the defendant did not intend to consent, the time to make that clear was when the search began).

Pouncey next argues that even if he gave consent, it was involuntary. First, Pouncey contends that he was illegally seized, which tainted his later consent to search. *See United States v. Pedroza*, 269 F.3d 821, 827 (7th Cir. 2001) (explaining that an illegal seizure generally vitiates a suspect's subsequent consent to a search). Officers may conduct a *Terry* stop when they have "specific and articulable facts sufficient to give rise to a reasonable suspicion that a person has committed or is committing a crime." *United States v. Shields*, 789 F.3d 733, 743 (7th Cir. 2015) (quoting *United States v. Johnson*, 910 F.2d 1506, 1508 (7th Cir. 1990)). Moreover, officers may conduct a *Terry* stop within a home's curtilage. *See United States v. Richmond*, 924 F.3d 404, 412 (7th Cir. 2019), *cert. denied*, 2020 WL 872444 (U.S. Feb. 24, 2020). Here, the officers conducted a valid *Terry* stop. First, they received a ShotSpotter report identifying gunshots at the residence. Second, when they arrived, they heard gunshots in the rear of the house. Third, they saw a person in a white t-shirt run into the house as they approached. Fourth, they saw no footprints in the snow in the backyard or on the porch stairs, and no bullet holes in the house, indicating that it was the shooter who entered the home. Fifth, a man in a white t-shirt exited the house from the basement. These facts are easily sufficient to support a reasonable suspicion that Pouncey was the person who fired the weapon and that he could be guilty of reckless discharge of a firearm or unlawful possession. That is also what distinguishes this case *United States v. Palomino-Chavez*, 761 Fed. Appx.

637 (7th Cir. 2019), and *United States v. Lopez*, 907 F.3d 472 (7th Cir. 2018), both of which involved situations where the officers lacked reasonable suspicion to conduct a stop.

Having determined that an illegal seizure did not occur, the Court still must decide whether Pouncey voluntarily consented. When a defendant claims that he was coerced into consenting, "the Government bears the burden of proving otherwise by a preponderance of the evidence." *United States v. Thurman*, 889 F.3d 356, 367 (7th Cir. 2018). "The voluntariness of consent is a question of fact informed by the totality of circumstances." *Id.* Factors that weigh on a court's determination include: "(1) the age, education, and intelligence of the defendant; (2) whether he was advised of his constitutional rights; (3) how long he was detained before consenting; (4) whether he consented immediately or upon numerous requests; (5) whether physical coercion was used; and (6) whether he was in custody when he consented." *Id.*

This is a close case. Supporting that consent was involuntary, Pouncey was handcuffed and surrounded by police officers while wearing a t-shirt in the snow, and the officers did not advise him of his rights. Moreover, Officer Gali said they would tear up Pouncey's house if they got a warrant. On the other hand, Pouncey was 43 years old and a native English speaker. He had been detained only a short period of time before he gave consent and it appears that the officers asked him for consent just once. Although Pouncey was handcuffed, the officers did not point a gun at him or otherwise use physical force. And unlike *Lynumn v. Illinois*, 372 U.S. 528 (1963), and *United States v. Bolin*, 514 F.2d 554 (7th Cir. 1975), the cases on which Pouncey

8

relies, the officers did not threaten to take his children away or arrest his girlfriend. While Officer Gali used unfortunate language, what he said was a true statement: probable cause existed to obtain a search warrant and the officers would have conducted a thorough search for the gun. *See United States v. Jones*, 614 F.3d 423, 426 (7th Cir. 2010) (baseless threats to get a search warrant vitiate consent but genuine intentions to get a warrant do not); *see also United States v. Medina*, 2011 WL 887752, at *9 (E.D. Wis. Mar. 11, 2011) (finding agent's statement that house would likely be torn up if suspect did not consent to a search did not render consent involuntary in part because the statement "was probably not all that misleading"). Finally, Pouncey appears calm and comfortable speaking with the officers in the bodycam footage. He was talkative and had no difficulty expressing himself or denying that he had a gun. Considering the totality of the circumstances, the government has proved by a preponderance that Pouncey voluntarily consented to the search of his home.

2) <u>Inevitable Discovery</u>

Even had Pouncey not provided consent to search his home, the evidence would be admitted under the inevitable discovery exception. The doctrine of inevitable discovery provides that "illegally obtained evidence will not be excluded if the government can prove, by a preponderance of the evidence, that the officers 'ultimately or inevitably' would have discovered the challenged evidence by lawful means." *United States v. Jones*, 861 F.3d 638, 643 (7th Cir. 2017) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)). To meet this burden, "the government must show

9

(1) that it had, or would have obtained, an independent, legal justification for conducting a search that would have led to the discovery of the evidence; and (2) that it would have conducted a lawful search absent the challenged conduct." *Id.* (quoting *United States v. Pelletier*, 700 F.3d 1109, 1116 (7th Cir. 2012)); *see also United States v. Tejada*, 524 F.3d 809, 813 (7th Cir. 2008) (under the doctrine of inevitable discovery, the government must prove that a warrant "would certainly, and not merely probably, have been issued had it been applied for.").

As to the first requirement, there existed ample probable cause to obtain a search warrant. As previously discussed, the officers heard shots in the backyard, they saw a person retreat quickly into the house as they approached, they discovered shell casings on the porch, and there were no footprints in the snow or bullet holes in the home, indicating that it was the shooter who retreated inside. Moreover, while he was detained, Pouncey informed the officers that he had served over ten years in prison, suggesting that he was a convicted felon. As to the second requirement, Officer Gali told Pouncey that he would obtain a search warrant if he did not consent to a search, and Gali later credibly testified that he planned to obtain a warrant had Pouncey not consented. At that point, the gun was in the home under a mattress and both Pouncey and his girlfriend were detained. Thus, even if the officers had waited for a warrant, the gun would still have been found under the mattress. *See United States v. Rivera*, 817 F.3d 339, 346 (7th Cir. 2016) (Hamilton, J., concurring in part) (concluding that defendants' motion to suppress should be denied based on inevitable discovery and stating that "as the majority points out, even if the agents had waited

10

to obtain a warrant, the defendants were not going anywhere. The agents had ample authority to detain them (i.e., to seize them) while they waited for the warrant"). Thus, a court would have issued a search warrant and the evidence would have been inevitably discovered.

3) Exigent Circumstances

For the sake of completeness, the Court briefly addresses the government's argument that exigent circumstances also justified the officers' entry into the house. The government contends that the presence of a minor child and the possibility of other victims created exigent circumstances that justified their entry. But even if this were true, the ensuing search must be "appropriately limited to the circumstances that justified it." *United States v. Salava*, 978 F.2d 320, 325 (7th Cir. 1992). The officers' extensive search for a weapon far exceeded what was necessary to ensure the child's safety. Indeed, even in *United States v. Haldorson*, 941 F.3d 284 (7th Cir. 2019), the case the government cites to support its position, the officers conducted only a plain view search and then stopped and applied for a warrant. Accordingly, even assuming exigent circumstances justified the officers' entry, their search exceeded the scope of the exigency. Nevertheless, because voluntary consent and inevitable discovery provide independent bases for legally recovering the evidence in Pouncey's home, his motion to suppress that evidence is denied.

III. Post-Arrest Statements

Finally, Pouncey argues that his post-arrest statements should be suppressed because of his illegal arrest. *See Brown v. Illinois*, 422 U.S. 590, 602 (1975). For the

reasons already stated, the officers lawfully searched Pouncey's curtilage and home, and then lawfully arrested Pouncey after they recovered the evidence at issue. As such, the motion to suppress Pouncey's post-arrest statements is denied.

## Conclusion

For the reasons stated above, the Court denies the motion to suppress [R. 24].

ENTERED:

*Thomas M Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: March 3, 2020